IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Jane Marie Kanik,                       )
                                        )
                     Plaintiff,         )
                                        )
        vs.                             )
                                        )
Nancy A. Berryhill, Deputy Commissioner of  )
Social Security for Operations,         )
                                        )       No. 2:18-cv-0160-HRH
                     Defendant.         )
_____ )

O R D E R

        This is an action for judicial review of the denial of disability benefits under Title II

of the Social Security Act, 42 U.S.C. §§ 401-434.  Plaintiff Jane Marie Kanik has timely filed

her opening brief,[1] to which defendant Nancy A. Berryhill has timely responded.[2]  Oral

argument was not requested and is not deemed necessary.

Procedural Background

        On December 23, 2013, plaintiff filed an application for disability benefits under Title

II of the Social Security Act, alleging that she became disabled on May 28, 2010.  Plaintiff

alleges that she is disabled due to moderate to severe hearing loss, developmental cognitive

---

[1]Docket No. 17.

[2]Docket No. 18.

disorder, anxiety, depression, and arthritis in the right hip. Plaintiff's application was denied initially and on reconsideration. After a hearing on February 19, 2015, an administrative law judge (ALJ) denied plaintiff's claim. On November 27, 2017, the Appeals Council denied plaintiff's request for review, thereby making the ALJ's March 23, 2016 decision the final decision of defendant. On January 16, 2018, plaintiff commenced this action in which she asks the court to find that she is entitled to disability benefits.

## General Background

Plaintiff was born on May 9, 1957. She was 58 years old at the time of the administrative hearing. Plaintiff has an associates degree in applied business. Plaintiff's past relevant work includes work as a payroll bookkeeping clerk, telephone solicitor, and teacher's aide.

## The ALJ's Decision

The ALJ first determined that plaintiff "last met the insured status requirements of the Social Security Act on December 31, 2015."[3] The date was extended by the Appeals Council to "at least March 31, 2017. . . ."[4]

The ALJ then applied the five-step sequential analysis used to determine whether an individual is disabled.[5]

---

[3]Admin. Rec. at 13.

[4]Admin. Rec. at 1.

[5]The five steps are as follows:

(continued...)

-2-

At step one, the ALJ found that plaintiff "did not engage in substantial gainful activity during the period from her alleged onset date of May 28, 2010 through her date last insured . . . ."[6]

At step two, the ALJ found that "[t]hrough the date last insured, the claimant had the following severe impairments:  hearing loss, a cognitive disorder, and an affective disorder NOS. . . ."[7]  The ALJ found that plaintiff's "degenerative joint disease of the right hip is not

_____

[5](...continued)

> Step one: Is the claimant presently engaged in substantial gainful activity?  If so, the claimant is not disabled. If not, proceed to step two.
> Step two: Is the claimant's alleged impairment sufficiently severe to limit ... her ability to work?  If so, proceed to step three.  If not, the claimant is not disabled.
> Step three: Does the claimant's impairment, or combination of impairments, meet or equal an impairment listed in 20 C.F.R., pt. 404, subpt. P, app. 1?  If so, the claimant is disabled. If not, proceed to step four.
> Step four: Does the claimant possess the residual functional capacity ("RFC") to perform ... her past relevant work?  If so, the claimant is not disabled. If not, proceed to step five.
> Step five: Does the claimant's RFC, when considered with the claimant's age, education, and work experience, allow ... her to adjust to other work that exists in significant numbers in the national economy?  If so, the claimant is not disabled. If not, the claimant is disabled.

Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006).

[6]Admin. Rec. at 13.

[7]Admin. Rec. at 13.

a severe impairment."[8]  The ALJ also "fully considered obesity in the context of the overall record of evidence . . . and determined that it is not a severe impairment."[9]

At step three, the ALJ found that "[t]hrough the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 . . . ."[10] The ALJ considered Listings 2.10 (Hearing loss not treated with cochlear implantation), 12.02 (neurocognitive disorders), 12.04 (depressive, bipolar and related disorders), and 12.06 (anxiety and obsessive-compulsive disorders).  The ALJ considered the "paragraph B" criteria and found that plaintiff had mild impairment in her activities of daily living; moderate limitations in social functioning; moderate limitations in concentration, persistence, and pace; and no episodes of decompensation that have been of extended duration.[11]  The ALJ also found that plaintiff did not meet the "paragraph C" criteria.[12]

"Between steps three and four, the ALJ must, as an intermediate step, assess the claimant's RFC."  Bray v. Comm'r Soc. Sec. Admin., 554 F.3d 1219, 1222-23 (9th Cir. 2009).  The ALJ found that plaintiff had "the residual functional capacity to perform a full

---

[8]Admin. Rec. at 14.

[9]Admin. Rec. at 14.

[10]Admin. Rec. at 15.

[11]Admin. Rec. at 16.

[12]Admin. Rec. at 16.

range of work at all exertional levels but with the following non-exertional limitations: she is limited to work that is not fast-paced. The claimant can respond appropriately to supervision and coworkers, and may have frequent contact with the public."[13]

The ALJ gave great weight to Dr. Nockleby's opinion.[14] The ALJ gave little weight[15] to Dr. McBride's opinion[16] and Dr. Penner's opinion.[17] The ALJ gave little weight to Dr. Mather's opinion that plaintiff had no impairments that would last more than 12 continuous months but gave great weight[18] to the rest of his opinion.[19] The ALJ gave little weight to

---

[13]Admin. Rec. at 17.

[14]Admin. Rec. at 19. Dr. Nockleby's opinion is discussed below in detail.

[15]Admin. Rec. at 18.

[16]On October 16, 2012, Dr. McBride opined that plaintiff's

> significant hearing loss . . . will impact [her] ability to obtain and/or maintain employment. Without amplification, 38-50% of speech cues at normal conversational levels are audible in the respective left and right ears. This hearing loss will not cause a loss of loudness as much as a loss of speech clarity. With amplification in each ear, speech audibility can be improved to 93-95% in each ear.

Admin. Rec. at 567.

[17]On May 13, 2014, Dr. Eric Penner opined that plaintiff had no restriction of activities of daily living; mild difficulties in maintaining social functioning; and mild difficulties in maintaining concentration, persistence, or pace. Admin. Rec. at 101.

[18]Admin. Rec. at 20.

[19]On May 7, 2014, John D. Mather, Ph.D., did a psychological evaluation "to assist in the determination of eligibility for Social Security Disability benefits." Admin. Rec. at
(continued...)

plaintiff's GAF scores.[20] The ALJ gave little weight to the lay testimony of plaintiff's sister, Susan Davis.[21]

The ALJ found plaintiff's pain and symptom statements less than credible because of inconsistencies between her statements, her daily activities and the medical evidence.[22]

At step four, the ALJ found that "[t]hrough the date last insured, the claimant was capable of performing past relevant work as a bookkeeping clerk and as a teacher's aide."[23] The ALJ rejected plaintiff's argument that her past relevant employment had been "sheltered" employment.[24]

---

[19](...continued)
576. Dr. Mather opined that plaintiff "would be able to effectively and consistently perform both simple and complex work-like procedures in a vocational setting[,]" did not "appear to have any deficits related to memory or understanding which would prevent" her "from working[,]" had "adequate levels of sustained and focused attention and persistence in concentration", "would likely understand the need for and be able to maintain consistent attendance at a place of employment[,]" had "no observed social difficulties that would preclude [her] from successfully interacting with others in a work environment[,]" "would not likely have any difficulties adapting to changes in routine or environmental perturbations" and "would likely be able to recognize and avoid common vocational hazards and take appropriate action if/when emergent situations arose." Admin. Rec. at 582-583.

[20]Admin. Rec. at 21.

[21]Admin. Rec. at 21. The testimony of Susan Davis is discussed below in detail.

[22]Admin. Rec. at 21.

[23]Admin. Rec. at 21.

[24]Admin. Rec. at 22. Social Security regulations "describe sheltered work as work 'done under special conditions[]', including that the claimant received special assistance, required special equipment, was allowed to work irregular hours or take frequent rest (continued...)

Although not required to make step five findings, the ALJ made such findings. At step five, the ALJ found that "there are other jobs that exist in significant numbers in the national economy that the claimant also can perform."[25] This finding was based on the Medical-Vocational Guidelines.[26]

The ALJ concluded that plaintiff "was not under a disability, as defined in the Social Security Act, at any time from May 28, 2010, the alleged onset date, through December 31, 2015, the date last insured. . . ."[27]

## Standard of Review

Pursuant to 42 U.S.C. § 405(g), the court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner. . . ." The court "properly affirms the Commissioner's decision denying benefits if it is supported by substantial evidence and based on the application of correct legal standards." Sandgathe v. Chater, 108 F.3d 978, 980 (9th Cir. 1997). "Substantial evidence is 'more than a mere scintilla but less than a preponderance; it is such relevant evidence as

---

[24](...continued)
periods, and was permitted to work at a lower standard of productivity or efficiency than other employees." Estrella v. Colvin, 174 F. Supp. 3d 1090, 1105 (D. Ariz. 2016) (quoting 20 C.F.R. § 416.973(c)); see also SSR 83-33 ("Sheltered employment is employment provided for handicapped individuals in a protected environment under an institutional program").

[25]Admin. Rec. at 23.

[26]Admin. Rec. at 23-24.

[27]Admin. Rec. at 24.

a reasonable mind might accept as adequate to support a conclusion.'" Id. (quoting Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995)). "'To determine whether substantial evidence supports the ALJ's decision, [the court] review[s] the administrative record as a whole, weighing both the evidence that supports and that which detracts from the ALJ's conclusion.'" Id. (quoting Andrews, 53 F.3d at 1039). If the evidence is susceptible to more than one reasonable interpretation, the court must uphold the Commissioner's decision. Id. But, the Commissioner's decision cannot be affirmed "'simply by isolating a specific quantum of supporting evidence.'" Holohan v. Massanari, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999)).

## Discussion

Plaintiff first argues that the ALJ erred at step two by not finding her right hip impairment to be a severe impairment. "[T]he step-two inquiry is a de minimis screening device to dispose of groundless claims." Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996). "An impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality that has 'no more than a minimal effect on an individual's ability to work.'" Id. (quoting SSR 85–28).

The ALJ acknowledged that plaintiff's September 2013 x-rays showed severe degenerative changes to her right hip,[28] but he also noted that in May 2014, she had a normal

---

[28]Admin. Rec. at 676.

gait and her mobility did not appear to be impaired by pain[29] and that in 2016, she "was described as having a normal gait, with the capability of undergoing exercise testing, participating in exercise programs, and using a treadmill."[30]

But, as plaintiff points out, she never claimed that her hip pain caused an antalgic gait. Rather, she claimed that her hip pain limited her ability to sit, stand, and walk for extended periods. Thus, whether she had a normal gait is largely irrelevant. Moreover, at times her gait was not normal.[31] As for her ability to use the treadmill, she was only able to "ambulate" on the treadmill when taking the stress test for five minutes[32] and it is reasonable to assume that this was due to the pain in her right hip.

There was substantial evidence in the record that plaintiff's right hip impairment was more than a slight abnormality. The ALJ erred in not including plaintiff's right hip impairment as a severe impairment at step two.

Defendant argues that this error was harmless. Error is harmless if it is "inconsequential to the ultimate nondisability determination." Stout, 454 F.3d at 1055. Defendant argues that any failure of the ALJ at step two as to plaintiff's right hip impairment would not have affected the ultimate disability determination. This argument is based on the ALJ's step four

---

[29]Admin. Rec. at 628.

[30]Admin. Rec. at 14.

[31]Admin. Rec. at 590, 599, 659.

[32]Admin. Rec. at 640.

findings. At step four, the ALJ found that plaintiff could perform her past relevant work as a bookkeeping clerk, which is a sedentary job.[33] Plaintiff testified that her right hip limits her in standing and sitting but that she could work at a job that would allow her to sit most of the day with the option to get up and move around[34] and the vocational expert testified that plaintiff's past relevant work as a bookkeeping clerk might allow a sit/stand option.[35] Thus, defendant argues that even if the ALJ had included plaintiff's right hip impairment as a severe impairment, the ALJ would still have found that plaintiff was not disabled because she could still work as a bookkeeping clerk.

The problem with defendant's argument is that the vocational expert did not testify that there would be bookkeeping jobs available that would allow a sit/stand option, only that there <u>might</u> be such jobs available and that such a job might require an accommodation from the employer.[36] If the ALJ had considered plaintiff's right hip impairment a severe impairment, it is possible that he might have included a sit/stand option in her RFC or other limitations related to her right hip impairment. If such limitations had been included, it is possible that the ALJ would have found plaintiff disabled. The ALJ's step two error was not harmless.

---

[33]Admin. Rec. at 74.

[34]Admin. Rec. at 67.

[35]Admin. Rec. at 77.

[36]Admin. Rec. at 77.

Plaintiff next argues that the ALJ erred by not including any hearing limitations in her RFC. Plaintiff argues that it was error for the ALJ to find that she had a severe hearing loss at step two but then fail to include any hearing limitations in her RFC, particularly since the ALJ found that "[w]hile addressed through the use of hearing aids, the claimant still has a measurable loss of hearing function which may tend to interfere with her ability to work."[37] Plaintiff argues that the ALJ was required to explain why he did not include any limitations related to an impairment he found severe. Plaintiff acknowledges that the ALJ made reference to Dr. Bartell's[38] finding that plaintiff "could communicate adequately using hearing aids and had speech discrimination scores of 88 percent in the right ear and 40 percent in the left ear."[39] The ALJ explained that Dr. Bartell's finding "supports the limitation in the claimant's residual functional capacity that she have only frequent contact with the general public and that she cannot perform fast-paced work."[40] Plaintiff argues, however, that the ALJ did not explain how her hearing loss was accommodated by these limitations.

---

[37]Admin. Rec. at 20.

[38]Dr. Bartell was an ENT doctor who evaluated plaintiff's hearing loss on May 15, 2014. Based on his exam, Dr. Bartell concluded that plaintiff "has a significant sensorineural hearing loss, greatest in the left ear" but that "[s]he can communicate adequately using hearing aids[.]" Admin. Rec. at 586.

[39]Admin. Rec. at 18.

[40]Admin. Rec. at 18.

"In making his RFC determination, [an] ALJ [must take] into account those limitations for which there was record support that did not depend on [a claimant's] subjective complaints." Bayliss v. Barnhart, 427 F.3d 1211, 1217 (9th Cir. 2005). Given that the ALJ found that plaintiff "has a measurable loss of hearing function which may tend to interfere with her ability to work[,]"[41] the ALJ either should have included hearing limitations in plaintiff's RFC or explained why he was not including any hearing limitations in her RFC. The ALJ's attempted explanation was not adequate. It is not at all clear how excluding fast-paced work and constant contact with the public accommodates plaintiff's hearing loss.

Plaintiff next argues that the ALJ erred by failing to include in her RFC limitations that were consistent with Dr. Nockleby's opinion. The ALJ gave great weight to Dr. Nockleby's opinion, but then, according to plaintiff, failed to include all the limitations that Dr. Nockleby assessed.

Donald M. Nockleby, Ph.D., did a neuropsychological evaluation on January 6, 2012 to assist with vocational planning. Based on his examination and testing, Dr. Nockleby offered the following opinion:

> 1. The client has used Vocational Rehabilitation services in the past, and can continue to benefit from them. Without VR support, she will struggle in obtaining employment. The problems that she has had historically (decreased coping skills, slower than average productivity speed) are likely to increase as

---

[41]Admin. Rec. at 20.

she ages, with normal development changes associated with age, with consequences for employability.

2.  Her strengths include a warm and friendly manner, which could be effective in casual public interaction.  She would be a pleasant co-worker.

3.  She has had some success with jobs involving high structure, although her pace of performance and potential for increased errors could interfere with maintaining a job, where high productivity and error-free performance are important.  She has been modestly successful with bookkeeping jobs, and evidently was sufficiently conscientious in these tasks that she performed OK.

She does best with 'one task to do at a time' and would have difficulty, or could not, multi-task.  Cognitive inflexibility, difficulty simultaneously monitoring several things at a time, difficulty quickly switching from a task she is engrossed in to take care of another task, are elements of her cognitive style that put limitations on the kinds of work she can do.

The non-verbal learning/cognitive disorder implies that she needs to be taught explicitly what the work task is, and generally cannot 'read between the lines', cannot readily discern what to do on her own, cannot organize and prioritize work tasks. She is unlikely to go outside of the tasks that she is assigned, to spontaneously help on things that need to be done and lacks [the] flexibility expected of many workers.

4.  She will benefit from job development and job coaching services.  It will be very difficult to obtain work on her own and maintain the job without transitional services from RSA.  Job Coaching could be phased out, after she masters the job, but an employer needs to understand her limitations and not place her in a position beyond her capabilities.

It is likely that, once placed in a job, she will require more time than average to learn new job sequences, and will need above average supervisory time as she learns a new position.

The jobs that she may be placed in could be those that she has had some success with in the past. Avoid work with high productivity demands and that could be considered high stress jobs. Work with a supportive employer would be desirable. She might need upgrading of bookkeeping skills if placed in that kind of work, but would need a low-pressure job. Data-entry could be considered, but it is likely that she would have some difficulty meeting productivity standards. She might function as a floor clerk in some department store settings where she had . . . routine and limited tasks to do, although it might be difficult for her 'see' what needs to be done and initiate it. She could function as a 'greeter' in a store. She may function well in a low-production job, such as a library aide at a front-desk or filing books. She would likely do well as a file clerk in a medical clinic or in an office setting. She could perform routine telephone work that is fairly scripted, such as reminding patients of appointments.

5. If she cannot be placed in a job with her current skills, given she has been out of work for an extended time, she may need to go through Work Adjustment Training, with a job targeted after that point.

6. Although she needs the health coverage that would come with full time employment, she may do best starting at part-time and increasing hours to her tolerance.

7. Her emotional coping difficulties appear to be addressed effectively with her current medication and counseling. Feedback and instruction in 'pragmatics' of communications could be helpful.[42]

The ALJ noted that it was Dr. Nockleby's opinion that plaintiff "does best when given

one task to complete at a time and would have difficulty, or could not, multi-task" and that

---

[42]Admin. Rec. at 509-510.

she "should avoid high productivity demands and high-stress job placements."[43] The ALJ further noted that Dr. Nockleby "suggested that [plaintiff] 'will need to work at an entry-level position that is structured and routine, low in stress, does not require multi-tasking, and has low production requirements.'"[44] The ALJ explained that he was incorporating these limitations into plaintiff's RFC by limiting her to "work that is not fast-paced and which does not feature constant contact with the general public."[45]

Plaintiff argues, however, that Dr. Nockleby's opinion supports additional limitations and work accommodations. In her opening brief, plaintiff seemed to suggest that the ALJ should have limited her to unskilled work based on Dr. Nockleby's opinion. But, as defendant is quick to point, Dr. Nockleby opined that "[t]he jobs that she may be placed in could be those that she has had some success with in the past[,]"[46] which include bookkeeping jobs, which are not unskilled jobs.

In her reply brief, plaintiff identifies additional limitations that she argues the ALJ should have included in her RFC based on Dr. Nockleby's opinion. She contends that the ALJ failed to include any limitations related to her limited coping skills, her slower than average production speeds, her inability to deal with work-related stress, her inability to

---

[43]Admin. Rec. at 19.

[44]Admin. Rec. at 19.

[45]Admin. Rec. at 19.

[46]Admin. Rec. at 510.

multi-task and switch between tasks, her need for a supportive employer, and her need for limited working hours. Plaintiff insists that these are all limitations assessed by Dr. Nockleby and that the ALJ should have either included these limitations in her RFC or explained why he did not include them.

The ALJ erred as to Dr. Nockleby's opinion. The ALJ gave Dr. Nockleby's opinion great weight but did not include many of the limitations assessed by Dr. Nockleby or explain why particular limitations were not included.

Plaintiff next argues that the ALJ erred in finding her pain and symptom statements less than credible. "An ALJ engages in a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible." Garrison v. Colvin, 759 F.3d 995, 1014 (9th Cir. 2014). "'First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged.'" Id. (quoting Lingenfelter v. Astrue, 504 F.3d 1028, 1035-36 (9th Cir. 2007)). "In this analysis, the claimant is not required to show 'that h[is] impairment could reasonably be expected to cause the severity of the symptom []he has alleged; []he need only show that it could reasonably have caused some degree of the symptom.'" Id. (quoting Smolen, 80 F.3d at 1282)). "Nor must a claimant produce 'objective medical evidence of the pain or fatigue itself, or the severity thereof.'" Id. (quoting Smolen, 80 F.3d at 1282). "If the claimant satisfies the first step of this analysis, and there is no evidence of malingering, 'the ALJ can reject the claimant's

testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so.'" Id. at 1014-15 (quoting Smolen, 80 F.3d at 1281). "This is not an easy requirement to meet: 'The clear and convincing standard is the most demanding required in Social Security cases.'" Id. at 1015 (quoting Moore v. Comm'r of Soc. Sec. Admin., 278 F.3d 920, 924 (9th Cir. 2002)). "In evaluating the claimant's testimony, the ALJ may use 'ordinary techniques of credibility evaluation.'" Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012) (quoting Turner v. Comm'r of Social Sec., 613 F.3d 1217, 1224 n.3 (9th Cir. 2010)). "For instance, the ALJ may consider inconsistencies either in the claimant's testimony or between the testimony and the claimant's conduct, unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment, and whether the claimant engages in daily activities inconsistent with the alleged symptoms[.]" Id. (internal citations omitted).

The ALJ found plaintiff's pain and symptom statements less than credible because of inconsistencies between her statements, her daily activities and the medical evidence.[47] While these are proper reasons for an ALJ to find a claimant's statements less than credible, the ALJ erred as to plaintiff's credibility because he did not explain this finding. "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998) (quoting Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995)). After stating

---

[47]Admin. Rec. at 21.

that he found plaintiff's statements less than credible because they were inconsistent with her daily activities and the medical evidence, the ALJ proceeded to compare statements made by plaintiff's sister, Ms. Davis, with other evidence in the record. The ALJ did not cite to any statements made by plaintiff that the ALJ found to be inconsistent with her daily activities and the medical evidence. Thus, the ALJ erred as to plaintiff's credibility.

Defendant's arguments to the contrary are unavailing. First, defendant argues that the ALJ properly found that plaintiff's statements were inconsistent with the medical evidence. For example, defendant contends that plaintiff's statements as to her hearing loss[48] were inconsistent with her objective test results.[49] Also by way of example, defendant cites to the testing done by Dr. Nockleby which showed that plaintiff had average verbal comprehension skills, average IQ, and average working memory index[50] and the testing done by Dr. Mather which showed that her cognitive functioning, linear and logical thought processes, memory, attention, and concentration were intact or within normal limits.[51] Defendant contends that plaintiff's statements about her cognitive difficulties were inconsistent with these objective test findings.

---

[48]Admin. Rec. at 213.

[49]Admin. Rec. at 511, 611.

[50]Admin. Rec. at 507.

[51]Admin. Rec. at 579.

The problem with defendant's argument is that the ALJ did not set out any of these inconsistencies. All the ALJ did was make a conclusory, unexplained finding that plaintiff's statements were inconsistent with the medical evidence. Such a general finding is not sufficient.

Defendant next argues that the ALJ properly found that plaintiff's statements were inconsistent with her daily activities and points out that the ALJ noted that plaintiff could take care of her personal needs, shop, do errands, and do housework.[52] But the ALJ did not explain how plaintiff's ability to do these daily activities was inconsistent with her pain and symptom statements.

Defendant also argues that the ALJ properly discredited plaintiff's statements because treatment for her hearing loss was effective. A favorable response to treatment may be a reason to find a claimant's pain and symptom statements less than credible. Tommasetti v. Astrue, 533 F.3d 1035, 1040 (9th Cir. 2008). But, this was not a reason that was given by the ALJ. "Long-standing principles of administrative law require [the court] to review the ALJ's decision based on the reasoning and factual findings offered by the ALJ—not post hoc rationalizations that attempt to intuit what the adjudicator may have been thinking." Bray, 554 F.3d at 1225. The court may only review "the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely." Orn v. Astrue, 495 F.3d 625, 630 (9th Cir. 2007).

---

[52]Admin. Rec. at 15-16.

Defendant next argues that the ALJ properly discounted plaintiff's statements because they were inconsistent with the opinions of Dr. Mather and Dr. Nockleby. An ALJ may discount a claimant's symptom testimony that is "unsupported by . . . any persuasive reports of his doctors[.]" Batson v. Comm'r of Social Sec. Admin., 359 F.3d 1190, 1196 (9th Cir. 2004). However, this was not a reason that was given by the ALJ, and as set out above, the court can only review the reasons given by the ALJ.

Finally, defendant argues that ALJ properly found plaintiff's statements less than credible based on her long employment history. But, this too was not a reason given by the ALJ, and as set out above, the court can only review reasons given by the ALJ.

Lastly, plaintiff argues that the ALJ erred as to the lay testimony in the record. "Lay testimony as to a claimant's symptoms is competent evidence that an ALJ must take into account, unless he or she expressly determines to disregard such testimony and gives reasons germane to each witness for doing so." Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001). The ALJ only considered the lay testimony provided by Susan Davis.

On March 4, 2014, Susan Davis, plaintiff's sister, completed a third-party function report. Mrs. Davis reported that plaintiff spends her time reading, watching TV, doing light housekeeping, cooking, and volunteering at the library 4 hours per week.[53] Mrs. Davis reported that "pain in hip affects" plaintiff's sleep and "anxiety prevents sleep."[54] Mrs. Davis

---

[53]Admin. Rec. at 240.

[54]Admin. Rec. at 241.

reported that plaintiff needs to be reminded to wear her hearing aids, clean her contacts appropriately, and to seek medical help.[55] She reported that plaintiff can prepare a complete meal and does so daily but does occasionally burn her food.[56] Mrs. Davis reported that plaintiff can do household chores, that it takes her 8-10 hours to clean the house, and that she needs reminders and encouragement to do this.[57] Mrs. Davis reported that plaintiff still drives but that she has "concerns regarding [plaintiff's] driving. She does not go on freeways or drive more than 10-15 miles from home."[58] Mrs. Davis also reported that plaintiff has had "multiple accidents" and that she does not feel that plaintiff should be driving.[59] Mrs. Davis reported that plaintiff "has never lived independently and had to pay bills related to utilities, etc."[60] Mrs. Davis reported that plaintiff has problems getting along with others because she "does not 'read' social cues of others; monopolizes conversation."[61] Mrs. Davis reported that plaintiff's "balance & coordination is poor. Due to hip injury, difficulty standing, walking

---

[55]Admin. Rec. at 242.

[56]Admin. Rec. at 242.

[57]Admin. Rec. at 242.

[58]Admin. Rec. at 243.

[59]Admin. Rec. at 243.

[60]Admin. Rec. at 243.

[61]Admin. Rec. at 245.

& bending for long periods. 'Zones out.' Does not process language quick enough."[62] Mrs. Davis reported that plaintiff can walk for 10 minutes, can pay attention sometimes for less than one minute, "can follow written instructions best when pictures are included", and does not follow spoken instructions "well, unless they are stated in short, briefly stated steps."[63] Mrs. Davis reported that plaintiff gets along with authority figures but does not handle stress well and "becomes very anxious & emotional. May yell or cry easily.[64] Mrs. Davis reported that "[i]n a work environment, [plaintiff] needs extensive explanation of 'why'" in order to handle changes in routine.[65] Mrs. Davis also reported that the

> jobs Jane ha[s] held the longest were typically with friends or family friends giving her the opportunity. Jane's employability, or lack of, is affected by multiple factors resulting in her disability. The combination of the following restricts her employability: nonverbal learning disability → poor writing and spelling; slow language processing; attention and focusing difficulties; sensory-motor issues impact speed & coordination, as well as awareness of physical space; poor social skills & difficulty interpreting & being aware of social cues; poor balance & coordination. Moderate to severe hearing loss → difficulty following directions & communication. Physical → injured hip & neck (movement restricted in neck).[[66]]

---

[62]Admin. Rec. at 245.

[63]Admin. Rec. at 245.

[64]Admin. Rec. at 246.

[65]Admin. Rec. at 246.

[66]Admin. Rec. at 247.

Mrs. Davis also stated that "[m]ost of the jobs Jane has had that have lasted more than a year involved structured tasks with supervision. She has been terminated from the last two due to difficulties with speed & understanding demands. She has spent a great deal of time doing job search activities and despite numerous interviews has not been able to obtain employment."[67]

On June 5, 2014, Mrs. Davis provided a witness statement, in which she shared "observations through both my perspective as [plaintiff's] sister and also as an educational psychologist with 39 years experience in working with disabled children and adults. . . ."[68] Mrs. Davis wrote:

> As a child I remember Jane as being "accident prone," with a variety of trips to the emergency room for stitches after falls and minor accidents. She is clumsy and uncoordinated and has poor balance. My parents pulled her out of the parochial elementary school we attended when she was in fourth grade due to chronic failures. She then began attending a public school where she received remedial reading instruction. Most school nights, my mother, a teacher, worked with Jane to relearn and complete her schoolwork. My mother also assisted her greatly when she attended school to earn her associates degree in accounting. Jane was bullied and made fun of throughout her schooling by other children.
>
> Jane has always lived with our parents or my sister. She has never lived independently. She has never earned an income sufficient to care entirely for her basic needs or living expenses. Jane has difficulty organizing the demands that this would require, as well.

[67]Admin. Rec. at 256.

[68]Admin. Rec. at 469.

While Jane is not mentally retarded, she does demonstrate evidence of cognitive deficits and immaturities, which affect her in educational, social and vocational pursuits. Jane had difficulty learning to read because she could not master phonics. With remediation she has learned to read, but spelling and written expression remain[] poor. As we grew older it became more and more apparent that Jane did not "fit in" socially with peers or in group social situations. She will stand too close to people seemingly unaware of an individual's personal space. She interrupts conversations and monopolizes conversations, and also repeats the same story multiple times to the same person. While talking to someone excessively she appears unaware of the other person's attempt or body language to end or break into the conversation. Our family has experienced many embarrassing moments in social situations with Jane. Jane enjoys reading and is good at modeling the behavior of others. This is where she has learned many of her social skills. An example of this is how I needed to tell her that when she made a phone call she needed to say, "Hello, how are you?" instead of immediately jumping into her agenda. Now when she calls she always starts with "Hello, how are you today?" in a robotic fashion.

In regards to self-care, Jane is able to care for her personal hygiene, cook and shop for meals, and travel about the community within a ten mile radius, independently. It is in the refinement of these skills she is lacking. For example, although she has a driver's license she has had numerous accidents and cannot drive on the freeway. She must be encouraged to obtain annual well women check-ups and becomes overly anxious during such exams, often inhibiting the outcome to obtain results. Either my sister or myself must accompany her to doctor visits as she does not always fully process the information given or the questions asked. When she went to get hearing aid[]s initially by herself the person talked her into getting $5000 aid[]s that were unnecessary and put her in undue debt.

Jane's language processing and perceptual-motor speed is slower than average. . . . Jane has difficulty grading her movements. Sometimes she moves too fast resulting in bump-

ing into something or something falling. Her tactile system appears hyposensitive. When she scratches herself she often draws blood. And a hug from Jane is usually a hard one. Jane's attention/concentration skills are compromised. She has difficulty multi-tasking or attending to more than one thing at a time. At times she becomes so "hyper-focused" on one thing that she is not aware of someone speaking to her or other things going on around her.

I have been concerned about Jane's emotional health for a long time. She has experienced many failures and frustrations. Her anxiety levels become high over what for most of us are routine situations. She has expressed to me on a number of occasions that she wishes she were dead, or that she feels she would be better off dead. Her coping skills are limited and she often either cries or yells in an angry outburst where she appears out of control.

Jane's learning disability impacts her executive functions, i.e., the coordination of basic cognitive processes during goal-oriented problem-solving. She has difficulty with perception, initiation, modulation gauge, focus and sustaining and inhibiting.

Jane has held approximately nine jobs in her lifetime. Her two longest were acting as an accounting assistant with individuals who had small payroll/accounting businesses and were friends of Jane or the family. She was also hired by a friend of mine to be a teacher's aide. Her two most recent jobs did not last long, one day and a few weeks, respectively. She has participated in job fairs, job training programs, and vocational rehabilitation. She has gone on many interviews, and has spent hours actively in job search activities. She is an individual who wants to work, be independent and productive. It is sad for me to watch her pursue this with no positive outcome.

> I love my sister. She is a caring and thoughtful individual. It is difficult to write this because it seems so negative. If anyone is deserving of assistance it is Jane.[69]

The ALJ disregarded Mrs. Davis' testimony because it was inconsistent with the medical evidence of record. The ALJ gave several examples of these inconsistencies.[70] "One reason for which an ALJ may discount lay testimony is that it conflicts with medical evidence." Lewis, 236 F.3d at 511. The ALJ did not err as to Mrs. Davis' testimony.

The ALJ however failed to consider the testimony offered by plaintiff's other sister, Joan Aeppli; her brother-in-law, Barry Davis; and Barbara Carney, a family friend. On June 4, 2014, Mr. Davis provided a witness statement. Mr. Davis wrote:

> The first impression that one might have of Jane is that she appears immature physically. Her movements appear awkward giving the impression that she might have a physical disability. She is very deliberate in her physical movements giving an impression of a lack of confidence in her ability to move physically. She has always been very dependent on family, and most of her social life revolves around family. Outside of family situations Jane is pleasant and congenial, but lacking the social skills to interact successfully with others. Again the impression is one of immaturity. She would not be considered rude, but again, one's impression would be that this person has a disability of some type.
>
> Mentally Jane has strengths. She is very conscientious, demonstrates good thinking skills, but is very slow to process situations and tasks. When placed in situations that require what is expected even in a menial type job it has been very difficult for her to perform in a timely manner. In situations where the task

---

[69]Admin. Rec. at 469-471.

[70]Admin. Rec. at 21.

involves one or more well-defined steps with no time or extraneous elements, she can be successful. Jane currently volunteers at the library shelving books and she experiences success. However, placed in a retail situation or office environment where the dynamics involve a multiple amount of factors, including time, the task at hand and customer or interpersonal relations, she has not been able to achieve expectations. It is difficult for her to attend to more than one facet of a process at a time. If the process involves multiple steps she becomes easily frustrated. We have even considered paying her for family tasks such as weekly cleaning or babysitting duties, but her physical and attention limitations make even these jobs difficult. Without supervision from other family members she could inadvertently create unintentional problems.

There has been a concerted effort in this family for many years to find a job Jane could handle and be successful with. But again, the dynamics involved with even minimal retail jobs has proven to be stressful for Jane and unacceptable to the employer. She can certainly contribute to society and family, and she has shown this in her volunteer work and even church work. However, after numerous attempts even these places have not hired her for a paid position. Jane loves her family and contributes in some way to all of us. This has made her feel worthwhile. But, with the demands placed upon employees in today's work environment her physical, emotional and mental disabilities have proven to be too much to overcome, leading to frustration, a lack of self-worth, and depression.[71]

On January 16, 2014, Barbara Carney, a family friend, wrote:

I met Jane for the first time in 1973 when I became friends with her older sister Joan. Over the years I have come to feel like a member of their family.

One of the first things I noticed when I met Jane was how easily she lost her balance. Over the years I have seen Jane become

---

more unsteady. She also seems not to understand the boundaries regarding one's personal space. Jane leans in closer when she's telling a story. Even if you back up, she leans forward into you.

Jane has some hearing loss. Many times when talking with her, I need to repeat myself. On the other hand, when Jane is telling me a story, she repeats herself, not because she is not heard, but because she doesn't remember telling me her story.

As Jane has gotten older, I have seen times when she becomes frustrated in situations; her frustration grows into anger. I have seen and heard her blow-ups several times.

There are times when Jane is easily distracted from a task she is doing; like she will be picking up the kitchen and walk away to another room not to return . . . maybe getting on the computer or turning on the TV. She seems to struggle with multi-tasking, but is more one directional.[72]

On June 6, 2014, Joan Aeppli, plaintiff's older sister and with whom plaintiff lives,

wrote:

My sister Jane was very sick when she was a baby. I can remember my mother getting help from a neighbor to try to get her temperature down. She would run high temperatures due to her blood not running through her heart chambers the right way. She had open heart surgery around the age of 2. The surgery was successful but Jane was always a little slower compared to other kids her age. She struggled in school.

Jane has always been very talkative. But she is unable to read a person's body language to know when they are no longer interested in what she has to say. She will repeat the same story over and over again like it is the first time she is saying it. Now as she has gotten older she will just stop in the middle of a

---

[72]Admin. Rec. at 473.

sentence and you have to remind her that she was saying something to you.

Jane has a one track mind. If she is thinking of something she can only focus on that one thing. If you try to talk to her or ask her to do something else most of the time she won't even acknowledge you because she is so focused on what she is doing. If you repeat yourself she gets really upset and will have an outburst of anger at you. We can be in a public setting or at home and if she gets frustrated she will have an outburst of anger.

Even though Jane has a really good memory as far as things that have happened in the past, as she has gotten older she has become more forgetful, such as turning off lights, locking house doors, turning off the water at the kitchen sink, shutting the refrigerator door. I think with her having a one track mind she gets side tracked on what she is thinking at that time. This also makes it impossible for her to multi task or set priorities, due to her only being able to focus on the one thought.

My sister Jane has been diagnosed with severe to moderate hearing loss. She wears hearing aids in both ears. Her left ear is worse than her right. It is hard for her to hear clearly unless you are standing right in front of her. Jane has always had an issue with her balance as well.

Back in 2011 my sister Jane had a very bad fall. She hurt her right leg. Now she walks with a bad limp due to muscle damage. It has caused problems with her right knee as well. Due to the injury she can only stand and walk for short periods of time.

I have tried to give you some history about my sister Jane. Jane always tries to do her best in whatever she does. Unfortunately, her disabilities have made it very hard for her to work and keep a job.

Jane has been searching for work for years now[. S]he has been hired a couple of times for no longer than a couple of weeks and then let go.[73]

Defendant concedes that it was error for the ALJ not to consider the foregoing lay testimony[74] but argues that this error was harmless. "[W]here the ALJ's error lies in a failure to properly discuss competent lay testimony favorable to the claimant, a reviewing court cannot consider the error harmless unless it can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination." Stout, 454 F.3d at 1056. Defendant argues that consideration of Aeppli's, Mr. Davis', and Carney's testimony would not have resulted in a different disability determination because their testimony was similar to plaintiff's properly rejected symptom testimony and because any limitations that their testimony suggest were addressed in plaintiff's RFC.

But, as discussed above, the ALJ did not properly reject plaintiff's symptom testimony nor did the ALJ include all the limitations suggested by the lay testimony of Mr. Davis, Aeppli, and Carney in plaintiff's RFC. Although it is possible the ALJ could have rejected this other lay testimony for the same reason he rejected Mrs. Davis' lay testimony, it just as possible that the ALJ might have decided to give some credence to the lay witnesses' statements if he had considered all of the lay testimony, instead of only Mrs. Davis'

---

[73]Admin. Rec. at 474-475.

[74]Defendant's Brief at 14, Docket No. 19.

testimony.  Thus, the court cannot conclude that the ALJ's error as to the lay testimony was harmless.

Because the ALJ erred, the court must decide whether to remand this matter for further proceedings or for an award of benefits.  "Remand for further administrative proceedings is appropriate if enhancement of the record would be useful."  Benecke v. Barnhart, 379 F.3d 587, 593 (9th Cir. 2004) (emphasis omitted).  "Conversely, where the record has been developed fully and further administrative proceedings would serve no useful purpose, the district court should remand for an immediate award of benefits."  Id.

Here, the record has not been fully developed.  Further proceedings are necessary so that the ALJ, at a minimum, can reassess plaintiff's RFC and consider all the lay testimony.

Moreover, the court "may remand on an open record for further proceedings 'when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act.'"  Brown-Hunter v. Colvin, 806 F.3d 487, 495 (9th Cir. 2015) (quoting Garrison, 759 F.3d at 1021).  This is such a case.

Conclusion

Defendant's final decision is reversed and this matter is remanded for further proceedings.

DATED at Anchorage, Alaska, this 17th day of August, 2018.

/s/ H. Russel Holland
United States District Judge